IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THOMAS SOBIECH, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>U.S. GAS & ELECTRIC, INC., i/t/d/b/a PENNSYLVANIA GAS & ELECTRIC; ENERGY SERVICES PROVIDERS, INC., i/t/d/b/a PENNSYLVANIA GAS & ELECTRIC; and PENNSYLVANIA GAS & ELECTRIC,<br><br>Defendants. | No: 2:14-CV-04464-GAM |

**PLAINTIFF THOMAS SOBEICH'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)**

Plaintiff Thomas Sobeich, through his undersigned counsel, submits this opposition to the Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6) of Defendants U.S. Gas & Electric, Inc. (i/t/d/b/a Pennsylvania Gas & Electric), Energy Service Providers, Inc. (i/t/d/b/a Pennsylvania Gas & Electric), and Pennsylvania Gas & Electric (collectively, "Defendants").

**INTRODUCTION AND FACTS**

In 1996, Pennsylvania opened up its electricity market to competition to allow market forces to lower energy prices. First Amended Class Action Complaint (D.E. 17) ("FAC") ¶¶ 8-11. Stepping into this unregulated marketplace for residential electric supply, Defendants offered, in step one of their scheme, a truly competitive rate for the first month of service. Defendants stated in its enrollment package that "[w]e are committed to helping you lower your

total energy costs" and offered Plaintiff and the putative class a "competitive electricity supply program." Defendants promised Plaintiff that he would "receive [Defendants'] competitively priced variable rate" which "competitively priced" rate reflected the "cost of electricity, including *energy, other wholesale market services*, the associated transmission and distribution charges[1] and *other market-related factors* for your utilities transmission zone . . . ; plus all applicable taxes, fees, charges, costs, expenses and margins."  *Id.*, ¶¶ 8-13, 16-18, 25-26, Exhibit A (emphases added).

When the first few bills came to Plaintiff, Defendants' rate was truly competitive, just as the initial "teaser" rate had been. *Id.* ¶25, Exhibit A. However, as the months went on, Defendants disregarded the promise of "competitive" pricing set to "market" factors. *Id.* ¶¶ 20-22, 44. Soon, Defendants' rate crept up to over three times the rate charged by the old monopolist, PPL, and stayed there. *Id.* ¶ 28.

Although Defendants' rate plan was "variable," such a stark change in pricing relative to the competitive electricity market was not contemplated in the enrollment package Defendants sent to Plaintiff. This package included an Enrollment Confirmation letter (a prefatory and explanatory cover letter) as well as Defendants' Terms and Conditions. *Id.* ¶15. To be sure, the promises of the "competitive electricity supply program" and the "competitive rate" are only to be found in the prefatory and explanatory cover letter ("welcome letter" as Defendants describe it in their Brief). Rather, the Terms and Conditions make reference instead to the "Price" being

---

[1] As the Terms and Conditions make clear, "associated transmission and distribution charges" are uniform charges set by the Public Utility Commission and the Federal Regulatory Commission, and the same for Defendants as for all the other vendors in the Pennsylvania electricity market. *Id.*, Exhibit A at ¶ 1("The PUC regulates distribution prices and services. The Federal Regulatory Commission regulates transmission prices and charges.") Similarly, the reference to "all applicable taxes, fees, charges. . . " would be generally applicable charges that would impact Defendants' and their competitors' rates in the electricity market in Pennsylvania in the identical way.

set by the costs of "other market services", "energy" costs, and "other market-related factors." However, the Price Defendants eventually charge Plaintiff was not "competitive" as it failed to genuinely consider "market" factors.

Plaintiff asserts three class claims against Defendants: damages for breach of contract; damages for breach of the covenant of good faith and fair dealing; and a declaration of Defendant's obligations to its customers with appropriate injunctive relief.

Defendants' argument is slickly drafted but lacking in legal support.  They compare their promises of "competitive" pricing in the "welcome letter" to throw-away advertising, and use the plainer Terms and Conditions to argue that there was no contractual obligation to set prices "competitively" and, accordingly, there can be no such covenant to do so.  However, neither the enrollment package Defendants sent to Plaintiff nor the law will allow them to promise "competitive" pricing only to deliver the kind of "supra-competitive" pricing the open electricity market was to eliminate.

The Terms and Conditions make repeated reference to Defendants' obligation to set pricing based on "market" factors.  If this were not sufficient, the Terms and Conditions make clear that the integrated agreement does not end with the Terms and Conditions, stating that "[t]his Agreement *and the Enrollment Confirmation* set forth the entire agreement between the parties with respect to the terms and conditions."  *Id.*, Exhibit A at ¶21 (emphasis added).  The promises in the "welcome letter" are part and parcel of the Terms and Conditions.  The "market" factors and all other factors that go into pricing are to be used to set "competitive" pricing. While damages for Defendants' breach of contract and the Covenant of Good Faith and Fair Dealing will go some part of the way to remedy Defendants' wrongs, a declaration of their rights and obligations are necessary to provide complete relief in this litigation.

## ARGUMENT

## LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) only requires that a plaintiff's complaint set forth "a short and plain statement of the claim." Fed.R.Civ.P. 8(a)(2). In elaborating on Rule 8(a), the Supreme Court has held that a complaint is sufficient if it "give[s] the defendant fair notice of- what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson,* 335 U.S. 41, 47 (1957); *see also Leatherman v. Tarrant County,* 507 U.S. 163 (1993). As the Court made clear, because the Rule only requires "notice pleading'", the plaintiff does not have to "set out in detail the facts upon which he bases his claim." *Id.* While Rule 8(a) only requires notice pleading and hence does not require the Plaintiff to set forth every fact that supports the claims, recent Supreme Court decisions have made clear that a plaintiff must provide sufficient factual allegations to make out a "plausible claim for relief." *Ashcroft v. Iqbal,* 129 Sup. Ct. 1937, 1950 (2009).

Against the liberal pleading requirements of Rule 8(a), Federal Rule of Civil Procedure 12(b)(6) provides that a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). Under Rule 12(b)(6), the defendant bears the burden of showing that no claim has been stated. *Piazza v. Major League Baseball,* 831 F .Supp. 420, 424 (E.D. Pa. 1993). In considering whether a defendant has met his burden, a court must "accept as true the facts alleged in the complaint and all reasonable inferences that can be drawn from them." *Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir. 1990). Moreover, a court should not dismiss a claim pursuant to Rule 12(b)(6) unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *HJ Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 249-50 (1989). As the Third Circuit has

acknowledged, "[t]he issue is not whether [the] plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Lake v. Arnold,* 112 F.3d 682, 688 (3d Cir. 1997) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)).

Moreover, the Third Circuit has consistently held that if a claim is vulnerable to dismissal under Rule 12(b)(6), the plaintiff should be given the opportunity to amend the complaint and cure the deficiency, even if the Plaintiff hasn't moved to amend the complaint. *Shane v. Fauver,* 213 F.3d 113, 116 (3d Cir. 2000). Indeed, as the court has recognized, under these circumstances, the failure of the district court to allow the amendment is an abuse of discretion:

> [T]his court has consistently held that when an individual has filed a complaint under § 1983 which is dismissable [sic] for lack of factual specificity, he should be given a reasonable opportunity to cure the defect, if he can, by amendment of the complaint and denial of an application for leave to amend under these circumstances is an abuse of discretion.

*Darr v. Wolf,* 767 F.2d 79, 81 (3d Cir. 1985); *see also Borelli v. City of Reading,* 532 F.2d 950, 951 n.1 (3d Cir. 1976).

## PLAINTIFF PROPERLY PLED A BREACH OF CONTRACT CLAIM

"A cause of action for breach of contract must be established by pleading (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." *Pennsylvania Supply, Inc. v. Am. Ash Recycling Corp. of Pennsylvania*, 895 A.2d 595, 600 (Pa. Super. 2006) (citing *Corestates Bank, N.A. v. Cutillo,* 723 A.2d 1053, 1058 (Pa. Super.1999)). In assessing the existence and duties of a contract and the related duties, the Court is to determine the intent of the parties: "A court's purpose in examining a contract is to interpret the intent of the contracting parties, as *objectively* manifested by them." *Synthes, Inc. v. Emerge Med., Inc.*, No. CIV.A. 11-1566, 2014 WL 2579286, at *46

5

(E.D. Pa. June 5, 2014) (emphasis added) (citing *Hullett v. Towers, Perrin, Forster & Crosby, Inc.,* 38 F.3d 107, 111 (3d Cir.1994)).  While not every term of a contract must be stated in complete detail, every element must be specifically pleaded.  *Pennsylvania Supply*, 895 A.2d at 600.

The Court is guided by several principles when determining the intent of the parties.  First, all relevant contract terms might not be expressly set forth in the four corners of the contract: "specific, express written language is not necessary for a particular contractual intent to exist in an agreement.  Rather, it is common for the intent of the contracting parties to be inherent in the totality of their contract."  *Murphy v. Dusquesne Univ. of the Holy Ghost*, 777 A.2d 418, 432 (Pa. 2001).  Second, the "commonly accepted and plain meaning" of words (like "market related factors") is to be used.  *Neuhard v. Range Resources-Appalachia, LLC*, --- F.SUpp.2d ---, 2014 WL 1745896, *4 (W.D.Pa. Apr. 30, 2014) (quoting *Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982).  Third, the Court "must consider the text as a whole when construing the language's operative effect."  *Id.*, at *3 (citing *Contrans, Inc. v. Ryder Truck Rental, Inc.*, 836 F.2d 163, 169 (3d Cir. 1987)).  Finally, "every agreement is made and to be construed with due regard to the known characteristics of the business to which it relates . . . and hence the language used in a contract will be construed according to its purport in the particular business."  *Id.*, at *4 (quoting *Franklin Sugar Ref. Co. v. Howell,* 274 Pa. 190, 118 A. 109, 110 (1922)).

Additionally, any agreement is to be construed against the party that wrote it.  *Synthes*, 2014 WL 2579286, at *47.  This is particularly important in understanding unilaterally drafted agreements like that prepared by Defendants.  *Fed. Ins. Co. v. McAnally*, No. CIV. A. 91-7676 F, 1992 WL 245871, at *2 (E.D. Pa. Sept. 22, 1992) aff'd, 993 F.2d 876 (3d Cir. 1993) (noting in

the context of insurance policies that "the policy behind interpreting ambiguous language . . . in the manner most favorable to the insured is to protect insurance purchasers from contracts of adhesion in which 'ambiguous language [is used] to entice insurance buyers, only to drop them into a pit of non-recoverability when claims are made....'") (quoting *Sykes v. Nationwide Mutual Insurance Company,* 413 Pa. 640, 198 A.2d 844, 845 (1964)).

As alleged, Defendant breached the price term in its agreement with Plaintiff by neglecting "market" factors to set a price in the competitive electricity marketplace Pennsylvania had established for customers like Plaintiff.  FAC ¶¶ 11, 20, 28, 29, 43-45.  The Terms and Conditions make clear that the "market" is the repeated touchstone of the "Price" and one of the few Price factors that are not set by governmental regulators or authorities.  The Terms and Conditions state that "Price.  Your rate will reflect your cost of electricity, including *energy, other wholesale market services*, the associated transmission and distribution charges and *other market-related factors* for your utilities transmission zone . . . ."  *Id.*, Exhibit A.  As alleged, Defendant breached this provision by not genuinely considering market factors in setting the Price. *Id.* ¶¶ 20, 28, 29, 43-45.

If there were any doubt, the agreement between the parties says more about the price term.  Defendants' Terms and Conditions make clear that the agreement between the parties includes the Enrollment Confirmation (the "welcome letter"). [2]  *See Southwestern Energy Prod.*

---

[2]     Defendants' argument that their election to consider other factors besides "market" factors cannot eliminate or annul its obligation to set the price so that it is "competitive." *Neuhard*, --- F.Supp.2d ---, 2014 WL1745896, at *4 (quoting *LJL Transp., Inc. v. Pilot Air Freigh Corp.*, 962 A.2d 639, 647-28 (Pa. 2009)).  Alternately, even if the "welcome letter" were not part of the integrated agreement between Plaintiff and Defendants, because several of the terms used in the Terms and Conditions related to the Price are ambiguous, the letter would be valuable in discerning the true intention of the parties.  *See e.g. Martin v. Donahue*, 698 A.2d 614, 616 (Pa. Super. Ct. 1997).

*Co. v. Forest Res., LLC*, 83 A.3d 177, 187 (Pa. Super. 2013), *app. den.*, 96 A.3d 1029 (Pa. 2014) ("Where several instruments are made as part of one transaction they will be read together, and each will be construed with reference to the other").  This Enrollment Confirmation offers both an initial, truly "competitive" rate and then makes clear that the future variable rate would continue to be "competitively" set.[3]  If there were to be any doubt about what Defendants' Price would be, Defendants made clear in their Enrollment Letter that it was *their* intention to offer truly competitive prices: "We are committed to helping you lower your total energy costs."

      Defendants mistake the importance of their decision to include such statements of intent and purpose in their agreement with Plaintiff.  Plaintiff is not arguing that Defendants breached the promises in the Enrollment Confirmation standing alone and as singular terms of an agreement, complaining that Defendants promised amorphously "competitive" rates or "lower . .. energy costs."  Rather, Defendants breached the integrated price term they drafted.  This is clear when the Enrollment Confirmation *and* Terms and Conditions are read together.  Not only did their subsequent pricing evidence that they failed to genuinely consider "market factors" in setting their pricing, they neglected to honor the unambiguous objective intent of the parties that Defendant would base its pricing on market factors, leading to "competitive" and "low" rates. *See e.g. Silverman v. Motorola, Inc.,* No. 07 C 4507, 2008 WL 4360648, at *10 (N.D. Ill. Sept. 23, 2008) (while "competitive" when sued alone might be mere puffery, "[t]he fact that the 'competitive' products are 'on track,' 'quite on track,' or 'keyed up,' would be material if in fact defendants knew that those products were not on track.")

---

[3] This promise and representation places this litigation in stark contrast to *Faistl* and *Slack*, the two cases primarily relied on by Defendants.

## PLAINTIFF PROPERLY PLED THAT DEFENDANTS BREACHED THE COVENANT OF GOOD FAITH AND FAIR DEALING

The Covenant of Good Faith and Fair Dealing is a protective and inclusive covenant between the parties to any agreement. "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." Restatement (Second) of Contracts § 205 (Restatement § 205); *see Kamco Industrial Sales, Inc. v. Lovejoy, Inc.*, 779 F.Supp.2d 416, 425 (E.D.Pa. 2011) (Pollack, J.) (noting that Restatement § 205 would likely be adopted by the Pennsylvania Supreme Court). "Good faith performance . . . of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." Restatement § 205; *see Montanez v. HSBC Mortg. Corp.* 876 F.Supp.2d 504, 513 (E.D.Pa. 2012). This independent "duty" to protect the "justified expectations of the other party" can be breached in an infinite variety of ways, but will clearly be breached by "evasion of the spirit of the bargain, lack of diligence . . . , willful rendering of imperfect performance, [and] abuse of power to specify terms." *Id.*, comment d.

Defendants breached the Covenant of Good Faith and Fair Dealing by setting prices in contravention of Plaintiff's "justified expectation." As discussed at length above, Defendants promised to consider market factors in setting the price of its energy, leading to prices that were "competitive" in the electricity marketplace, not triple the going rate. The need for the Covenant of Good Faith and Fair Dealing in this case is not only supported and evidenced by the pleadings, but clearly demonstrated by the arguments raised by Defendants in the pending Motion. Defendants essentially argue that there can be no breach of express contract because they had discretion to pick and choose among the various energy pricing factors (some clearly focused on the open "market" factors and others more ambiguously referring to "fees, charges, costs, expenses and margins") to set the rate it would charge Plaintiff. *See* Def. Br., p. 3 ("Plaintiff's

argument that the Defendants' breached promises to set rates keyed to market factors is contradicted by the express terms of the Agreement which specifically states that rates will be tied to market factors *and other factors.*" (emphasis added)).

Assuming Defendants reserved some discretion under the Terms and Conditions to set energy pricing exclusively to their own benefit, the Covenant of Good Faith and Fair Dealing limits that discretion to realize also the benefits Plaintiff sought when entering the agreement. *See Kamco*, 779 F.Supp.2d at 427-29. One purpose of the implied duty "is to prohibit a party from 'taking advantage of gaps in a contract in order to exploit the vulnerabilities that arise when contractual performance is sequential rather than simultaneous.'" *Kamco*, 779 F.Supp.2d at 426 (quoting cases).

*Kamco* illustrates this black letter principal. In *Kamco*, a sales representative was denied commissions based on the employer's invocation of a contract term that "No commissions will be paid on House Account sales. *The Company reserves the right to redefine these accounts.*" *Id.* at 427 (emphasis added in opinion). Denying the employer's motion for summary judgment, the Court noted that, reading the contract as a whole, the plaintiff "possessed a justifiable expectation that, at a minimum, [the employer] would not use its discretion . . . to deprive [the plaintiff] of its benefits under the Agreement by redefining all or substantially all of [the plaintiff's] accounts as House Accounts." *Id.* at 429. The Court added: "Good faith duties are implied 'where it is clear that an obligation is within the contemplation of the parties at the time of contracting or is necessary to carry out their intentions." *Id.* at 428. Similarly, in *Donahue v. Federal Express Corp.*, the court made clear that contractual obligations, even when they vest authority and discretion, must be in an "honest and meaningful" manner. 753 A.2d 238, 242 (Pa. Super 2000).

Breach of the Covenant of Good Faith and Fair Dealing is actionable here. Defendants do not truly argue to the contrary. Rather they argue that such claims are merely subsumed and limited by Plaintiff's (supposedly doomed) contact claims.[4] However, they do so only by continuing to ignore the "justified expectations" of Plaintiff when he changed energy suppliers and trusted Defendants to set energy prices on an on-going basis as they had promised. Such promises (like the duty to act in good faith and deal fairly) are not at odds with any express term in the Terms and Conditions. Defendants did not expressly reserve a right to set their rates

---

[4] As discussed below, Defendants' efforts to craft the remedies and the causes of action in their Motion are not properly brought as a dismissal of claims pursuant to Rule 12(b)(6) ("failure to state a claim"), but rather under Rule 12(f) through which pleadings can be streamlined. *NN&R, Inc. v. One Beacon Ins. Grp.*, 362 F. Supp. 2d 514, 525 (D.N.J. 2005) (quoting *McInerney v. Moyer Lumber and Hardware, Inc.,* 244 F.Supp.2d 393, 402 (E.D.Pa.2002)). The question raised by Defendants' Motion is not really *if* Plaintiff can bring a claim, but *whether* it is an independent cause of action or merely an additional facet of his contact claims. The Third Circuit has made clear that only claims for breach of the Covenant of Good Faith and Fair Dealing are only subsumed when "identical to" a second cause of action. *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 92 (3d Cir. 2000). However, at the pleadings stage, both theories of recover should remain independent. *Cf. In re Green Goblin, Inc.*, No. ADV 09-067, 2012 WL 1971143, at *1 (Bankr. E.D. Pa. May 31, 2012) (noting the independence of the claims for breach of contract from claims for the breach of the Covenant of Good Faith and Fair Dealing when allowing a claim for a breach of the Covenant of Good Faith and Fair Dealing to proceed independently of any contract claims); *see also Kamco*, 779 F.Supp.2d at 433 (noting independence of theory of recovery for breach of contract through constructive termination from breach of the Covenant of Good Faith and Fair Dealing); *Donahue*, 753 A.2d at 242 (noting distinction between an at-will contact and the Covenant of Good Faith and Fair Dealing). Defendants are arguing their "welcome letter" does not carry the force of the contract. The Rules expressly allow pleading in the alternative. Fed.R.Civ.P. 8(d). Ultimately, the claims for breach of contract and breach of the Covenant of Good Faith and Fair Dealing may merge, but they evidently have not yet. *See e.g. Morris v. Wells Fargo Bank N.A.,* No. 2:11CV474, 2012 WL 3929805, at *8 (W.D. Pa. Sept. 7, 2012) ("to the extent the breach of good faith claim contains allegations conceptually distinct from those in the breach of contract claim, they will be treated as being a part of and augmenting the breach of contract claim.")

supra-competitively or otherwise hold absolute discretion to set process. They certainly would not have won Plaintiff as a customer if they had. To the extent Defendants argue that they never promised "competitive" rates or assumed any limitation on its obligation to set rates, then the Covenant of Good Faith and Fair Dealing will protect Plaintiff's expectations under Defendant's Terms and Conditions.

## DEFENDANTS ARE PROPERLY SUBJECT TO DECLARATORY JUDGMENT

Defendants move to dismiss the Declaratory Judgment count despite the fact that the Declaratory Judgment Act ("DJA") "should be liberally construed to effectuate the ends of justice." *Tamco Corp. v. Fed. Ins. Co. of New York*, 216 F. Supp. 767, 771 (N.D. Ill. 1963) (citation omitted); *see also Cincinnati Ins. Co. v. Holbrook*, 867 F.2d 1330, 1333 (11th Cir. 1989) (*per curiam*) (the Declaratory Judgment Act "should be exercised liberally in favor of granting such relief in order to accomplish the purposes of the Declaratory Judgment Act.") Given its purpose, the DJA provides district courts with "wide discretion to provide declaratory relief." *Francis E. Parker Mem'l Home, Inc. v. Georgia-Pac. LLC*, 12-CV-02441, 2013 WL 2177974, at *18 (D.N.J. May 20, 2013). Such broad discretion is provided because the DJA "created a new"[5] and "additional remedy"[6], which is available to interested parties like the Plaintiff in this case. Such remedies are "appropriate even though other remedies are also available"[7], and relief under the DJA is proper either as "the basis of further relief necessary or proper against the adverse party"[8] (*e.g.*, to establish an essential component to liability) or "whether or not further relief is or could be sought" (28 U.S.C. § 2201).

---

[5] *Walker Process Equip., Inc. v. FMC Corp.*, 356 F.2d 449, 451 (7th Cir. 1966).
[6] *Balanyi v. Local 1031, Int'l Bhd. of Elec. Workers AFL-CIO*, 374 F.2d 723, 726 (7th Cir. 1967); *see also Prier v. Steed*, 456 F.3d 1209, 1212 (10th Cir. 2006) ("[Declaratory Judgment Act] enlarge[s] the range of remedies available") (citation omitted).
[7] *Davis v. Romney*, 490 F.2d 1360, 1370 (3d Cir. 1974).
[8] *Pub. Serv. Comm'n of Utah v. Wycoff Co., Inc.*, 344 U.S. 237, 245 (1952).

As the Supreme Court has stated, "the propriety of declaratory relief in a particular case will depend upon a circumspect sense of its fitness informed by the teachings and experience concerning the functions and extent of federal judicial power." *Pub. Serv. Comm'n*, 344 U.S. at 243. This sense of "fit" is hardly something that can be easily divined from the pleadings, especially when they are to be construed in the light most favorable to the Plaintiff.

Defendants have asked this Court to dismiss Plaintiff's request for relief under the Declaratory Judgment Act, 28 U.S.C. §2201, at the pleading stage, essentially attempting to foreclose declaratory relief entirely.

### A. The Availability of a Contract Claim Does not Support Dismissal of Plaintiff's Request for Declaratory Judgment

Defendants argue that Plaintiff's request for declaratory relief must also be dismissed not because it is not legally cognizable, but rather because such relief is not necessary. Def. Br., pp. 14-17. Defendants argue that a declaration of the parties' rights and obligations is pretty much what Plaintiff will get through his claim for breach of contract. *Id.*, pp. 14-15.

Initially, Defendants' attack on the requested equitable relief is essentially an effort to strike a potential remedy which must be done, if at all, pursuant to Rule 12(f). *See Perry v. Garcia*, 09CV622 LAB RBB, 2010 WL 3633042, at *15 (S.D. Cal. July 16, 2010) *report and recommendation adopted*, 2010 WL 3636188 (S.D. Cal. Sept. 13, 2010) ("Nevertheless, Rule 12(b)(6) does not provide for striking prayers for relief, and Rule 12(f) does not apply to Perry's request for injunctive relief. At this stage, Defendants' arguments are premature. If Plaintiff prevails on any claim, the parties may then litigate the appropriate remedy.") In contrast to a Motion under Rule 12(b)(6) for *failure to state a claim*, Rule 12(f) provides for the striking of "a pleading an insufficient defense or any redundant, immaterial, impertinent or scandalous matter."

Moreover, the Federal Rules make clear that it is long established that "[t]he existence of another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate." Fed.R.Civ.P. 57.  Importantly, the nature of relief sought through the Declaratory Judgment Act is not duplicative of the remedy for Defendants' breach of contract.  Rather, whereas the legal cause of action would only result in a verdict and award of damages, a Declaration of Defendants' obligations going forward can only be had through the Declaratory Judgment Act, along with an injunctive relief that would flow naturally from such a declaration, including changes in the Terms and Conditions or mandates relating to Defendants' price setting. *Powell v. McCormack*, 395 U.S. 486, 499, 89 S. Ct. 1944, 1952, 23 L. Ed. 2d 491 (1969) ("A declaratory judgment can then be used as a predicate to further relief, including an injunction.")

### B.     The Price Term Presents an Actual Controversy

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction ... [a court] may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).  Paralleling Article III of the Constitution, the Act "requires an actual controversy between the parties before a federal court may exercise jurisdiction over an action for a declaratory judgment."  *Teva Pharms. USA, Inc. v. Pfizer, Inc.,* 395 F.3d 1324, 1331 (Fed.Cir.2005).  The Court stated in *Aetna Life Insurance Co. v. Haworth,* 300 U.S. 227 (1937), that the test for determining whether there exists a justiciable "case or controversy" is whether the controversy "is definite and concrete, touching the legal relations of the parties having adverse legal interest." 300 U.S. at 240–41.  The Court explained further in *Maryland Casualty Co. Pacific Coal & Oil Co.*, that the determinative question is "whether the facts alleged, under the circumstances, show that there is a substantial controversy, between parties having adverse

14

legal interest, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." 312 U.S. 270, 273 (1941).

There is no dispute that there is Plaintiff has standing to sue Defendants – there is a substantial controversy in play, and the parties interests are sharply adverse. Defendants argue, however, that because Plaintiff has again switched energy suppliers, there is no "actual controversy" about Defendants' obligations under its agreement.

Defendants' rely on cases that are wholly inapposite. In *Global Fresh,* for example, the declaration sought was by the wholesale purchaser of fruit that it did not owe the seller any more money for fruit that had been paid for – yet the seller had not threatened, let alone filed suit. In contrast, Plaintiff has a live and actual dispute with Defendants about their obligations under their Terms and Conditions. Similarly, in *Delaware State University*, the Court faced a dispute between a property owner and the terminated property management company was solely over past damages - there was no possible future relationship and no conduct to change. Here, Defendants remain a competitor in the Pennsylvania electricity marketplace. Plaintiff will inevitably receive solicitations from Defendants and should be able to understand what Defendants are actually offering in that competitive marketplace.

Additionally, under Defendants' perception of the law, their wrongdoing would always evade declaratory or injunctive relief – customers will cancel their service with Defendants once their pricing practices are discovery. The present action is substantively similar to *Bowers v. City of Philadelphia*, 2006 WL 2818501(E.D. Pa. Sept. 28, 2006), in which this Court permitted a Plaintiffs' request for injunctive and declaratory relief to proceed even though the Plaintiffs had only alleged past harm. At issue in *Bowers* was plaintiffs' motion for class certification. *Id*. *Bowers* involved "allegations by pre-trial detainees in the Philadelphia Prison System ("PPS") of

severe prison overcrowding and concomitant dangerous, unhealthy, and degrading conditions." *Id*. In *Bowers* the defendant had argued that "the named plaintiffs lack standing to raise claims for injunctive and declaratory relief because they have alleged only past harm as pre-trial detainees." *Id*. After surveying Supreme Court authority on the importance of the availability of declaratory relief in a case like this one (*Id.* at **4-7), this Court held:

> However, we have already decided that an exception to mootness applies in this case because of the transitory nature of the harm involved in pre-trial detention. Were we to decide that despite this exception, the technical lack of standing made the named Plaintiffs' claims atypical of those they seek to represent, class certification would be impossible in any case involving pre-trial detention *or other harms of short duration*. We are unwilling to reach such a conclusion. Accordingly, Plaintiffs' Motion for Class Certification will be granted. (Emphasis added).

*Id.*, at *8.

Once Plaintiff realized that Defendants were overcharging him for his electrical service he switched providers to avoid any additional harm, as any rational person would have done. If and when the claims asserted in this litigation are developed for the class of other customers of Defendants, such declaratory relief will stave-off damages that have not yet been incurred.

## CONCLUSION

For all of the foregoing reasons, Defendants' Motion to Dismiss Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) must be denied.

Dated: November 10, 2014                    Respectfully Submitted:

                                                                 **SEEGER WEISS LLP**
/s/ Jonathan Shub
Jonathan Shub, Esquire
1515 Market Street, Suite 1380
Philadelphia, PA 19102
Phone: (215) 564-2300
Fax: (215) 851-8029
Email: jshub@seegerweiss.com

**Marcus & Mack, P.C.**
<u>/s/ Troy M. Frederick, Esquire</u>
Marcus & Mack, P.C.
Identification No: 207461
57 South Sixth Street
Indiana, PA 15701
Phone: (724) 349-5602
Fax: (724) 349-8362

*Attorneys for Plaintiff*
